UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 15 |
| | ) | |
| CREATIVE FINANCE LTD. | ) | Case No. 14-10358 (REG) |
| (IN LIQUIDATION), *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors in a Foreign Proceeding. | ) | |
| | ) | |

DECISION AND ORDER ON MOTION FOR
RECOGNITION AND CROSS-MOTION FOR DISMISSAL

APPEARANCES:

REID COLLINS & TSAI LLP
One Penn Plaza
New York, New York 10119
By:    Angela J. Somers, Esq. (argued)
        R. Adam Swick, Esq. (argued)
        Ann M. Bahr, Esq.
*Counsel to Liquidator of Creative Finance Ltd.*
  *and Cosmorex Ltd.*

VEDDER PRICE P.C.
1633 Broadway
New York, New York 10019
By:    Michael J. Edelman, Esq. (argued)
        Michael L. Schein, Esq. (argued)
        John E. Bradley, Esq.
*Counsel for Marex Financial Ltd.*

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this chapter 15 case commenced by the foreign representative liquidator (the

"**Liquidator**") of the debtors Creative Finance Ltd. ("**Creative Finance**") and Cosmorex Ltd.

("**Cosmorex**," and with Creative Finance, the "**Debtors**"), the Court has before it a contested

motion for section 1517 recognition, and a related motion by creditor Marex Financial Ltd.

("**Marex**"), the Debtors' only non-insider creditor, for dismissal under section 305 of the

Bankruptcy Code, by reason of the Debtors' bad faith.

The case presents two issues as to which the underlying caselaw law is thin.  First, are chapter 15's statutory requirements for recognition of a foreign main proceeding satisfied when—by the debtors' design—the foreign representative's activities before his chapter 15 filing have been so minimal that the Court cannot find that the Debtors' "Center of Main Interests" ("**COMI**") ever changed from the nation(s) where the Debtors actually did business to the different nation in which the foreign representative was appointed?

And second, must a U.S. Bankruptcy Court tolerate debtor bad faith in a chapter 15 case that a U.S. court would never tolerate in a case under any other chapter of the Code?

It is rare in chapter 15 cases for foreign representatives to do such minimal activity on behalf of the estates for whom they have been appointed, and even rarer for that to happen by design.  And while bankruptcy filings with debtor misconduct or only a single non-insider creditor are not all that rare in cases under chapter 11, they are quite unusual in cases under chapter 15.  Additionally, as the Second Circuit noted in its well known *Fairfield Sentry* decision,[1] a case of great importance here, "few courts have considered the meaning of COMI under chapter 15, especially with respect to the time frame and the factors that bear on the question."[2]  And while the ability of bankruptcy courts to protect against debtors' bad faith efforts to create a new COMI was expressly recognized by the Circuit in *Fairfield Sentry*, the Circuit there did not need to examine that ability in any significant way.  For each of those reasons, this case presents issues as to which there is only modest precedent in this district and circuit.

---

[1]     *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127 (2d Cir. 2013) ("***Fairfield Sentry***").

[2]     *Id.* at 133.

But the proper outcome with respect to the issues before this Court is not at all in doubt.

Cases that are very familiar to the international insolvency community (including, especially, the

*SPhinX* cases,[3] the *Bear Stearns* cases,[4] and their progeny[5]) make clear that a COMI in the

jurisdiction in which the foreign representative was appointed is essential to recognition as a

foreign main proceeding.  And while a COMI can (and not infrequently does) change from the

jurisdiction in which a foreign debtor actually did business to a "letterbox" jurisdiction,[6] it can do

so only where material activities have been undertaken in the jurisdiction in which the foreign

proceeding was filed—thus providing a meaningful basis for the expectations of third parties.

For reasons set forth below, the Court rules—consistent with principles articulated by the

Second Circuit in *Fairfield Sentry*—that while the Debtors' COMI *could have* changed to the

British Virgin Islands ("**BVI**") after the filing there and before the chapter 15 filing in the U.S., it

did not do so here.  By reason of the minimal activities by the Liquidator in the BVI, as

orchestrated by the Debtors' principals, the Debtors' COMI never changed; the Liquidator never

---

[3]   *See In re SPhinX, Ltd.,* 351 B.R. 103 (Bankr. S.D.N.Y. 2006) (Drain, J.) ("***SPhinX-Bankruptcy***"), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007) (Sweet, J.) ("***SPhinX-District***").

[4]   *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122 (Bankr. S.D.N.Y. 2007) (Lifland, C.J.) ("***Bear Stearns-Bankruptcy***"), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008) (Sweet, J.) ("***Bear-Stearns-District***").

[5]   *See In re Basis Yield Alpha Fund (Master),* 381 B.R. 37 (Bankr. S.D.N.Y. 2008) (Gerber, J.) ("***Basis Yield***"), and two of the three major reported decisions involving British American Insurance Company and a British American subsidiary:  *In re British Am. Ins. Co.,* 425 B.R. 884 (Bankr. S.D. Fla. 2010) (Kimball, J.) ("***British American-Recognition***"); *In re British Am. Isle of Venice, Ltd.,* 441 B.R. 713 (Bankr. S.D. Fla. 2010) (Kimball, J.) ("***Isle of Venice-Recognition***").

The third major *British American* decision, *British Am. Ins. Co. v. Fullerton (In re British Am. Ins. Co.),* 488 B.R. 205 (Bankr. S.D. Fla. 2013) (Kimball, J.), dealt principally with subject matter jurisdiction, the authority of bankruptcy judges to enter final orders, and abstention (all as contrasted to recognition), and would here be relevant only if the Court needed to address the section 305 issue.

[6]   The European Court of Justice used the "letterbox" appellation to describe a company "not carrying out any business in the territory of the Member State in which its registered office is situated," and which thus might present an instance where the presumption that the COMI is the registered place of business could be overcome.  *See Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.),* Case C-341/04, 2006 E.C.R. 1-3813, 2006 WL 1142304 (E.C.J. May 2, 2006), at ¶ 35 ("***Eurofood***").  The same description, citing to *Eurofood* and then U.S. caselaw citing *Eurofood,* was later used in *SPhinX-Bankruptcy,* 351 B.R. at 118; *SPhinX-District,* 371 B.R. at 19; *Bear Stearns-Bankruptcy,* 374 B.R. at 129 & n.8; *Bear Stearns-District,* 389 B.R. at 336-37; *Basis Yield,* 381 B.R. at 53 & n.58; and *Fairfield Sentry,* 714 F.3d at 136-37.

developed a COMI in the jurisdiction in which he was appointed; and chapter 15's statutory requirements for recognition as a foreign main proceeding were not satisfied. And for slightly different reasons, the Debtors never had even an "establishment" in the BVI, precluding recognition as a foreign nonmain proceeding either. As to each type of proceeding, recognition must be, and is, denied.

For that reason, the Court does not need to decide what it would have done if it had concluded that recognition had to be granted. In light of its conclusion that recognition here cannot be granted, the Court does not reach the issue of whether a foreign proceeding in which recognition has been granted is subject to abstention or dismissal under section 305.

Likewise, the Court does not need to decide what it would have done with the egregious bad faith it finds here if recognition—especially as a foreign main proceeding—had to be granted. But the Court observes that in chapter 15, as in chapter 11, U.S. courts need not tolerate debtor bad faith. Whether or not section 305 is an available mechanism to address bad faith (a matter that the Court, given its recognition ruling, does not here need to decide), other mechanisms exist under the Code. For example, although recognition as a foreign main proceeding, if granted, would make section 362 of the Code applicable to any assets in the United States,[7] relief from the stay could thereafter be granted "for cause."[8] And under extensive caselaw, bad faith filing is a well established basis for finding such "cause."[9] Though it is unnecessary to address the problem now, the Court is confident that U.S. courts and injured creditors, here and abroad, can be protected from such debtor bad faith.

---

[7]   *See* section 1520(a)(1).

[8]   *See* section 362(d)(1), a subsection of section 362 of the Code, which becomes applicable after recognition under section 1520(a)(1).

[9]   *See infra* n.145.

The Court's Findings of Fact and Conclusions of Law in connection with these

determinations follow.

Factual Summary

As described in more detail below, this chapter 15 case was brought as one of the several

steps in a scheme by the Debtors' principal Carlos Sevilleja ("**Sevilleja**")—referred to by the

Liquidator as "Carlos"[10]—to exploit a BVI liquidation proceeding as a device to thwart

enforcement of a $5 million judgment against the Debtors that Marex won in the courts of

England—and the most blatant effort to hinder, delay and defraud a creditor this Court has ever

seen.

In late July 2013, a lawsuit brought by Marex against the Debtors in the English High

Court of Justice was nearly over.  Entry of judgment for Marex against each of the Debtors was

imminent.  On July 19, 2013, in accordance with English practice, a judge of the English court

circulated a draft ruling advising of his decision to enter judgment in favor of Marex, in excess of

$5.6 million (U.S. equivalent), against each of the Debtors.  He further directed that the Debtors

make payment on the judgment by August 8, and restrained actions to thwart the judgment that

was about to be entered.  But between receipt of the draft ruling and the deadline for payment,

Sevilleja caused all of the Debtors' liquid assets—over $9.5 million—to be transferred out of the

Debtors' accounts in the U.K.

Though they did most of their business in the U.K. and suffered entry of a judgment

there, and though their operations were directed out of Spain and Dubai, the Debtors were

organized under the law of a letterbox jurisdiction—the British Virgin Islands—though they did

not do business there.  After an abortive effort by Marex to put the Debtors in involuntary

---

[10]       *See infra* n.75.

insolvency proceedings in the BVI and to appoint an independent liquidator there (which Marex withdrew about two months later), Sevilleja caused the Debtors to file their own *voluntary* insolvency proceeding in the BVI, and to appoint their own liquidator—giving the Liquidator just enough funding to comply with the minimum requirements of BVI law (such as sending out notices to creditors, holding creditor meetings, and making filings with the BVI court) but not enough to pursue or investigate the transfer of the $9.5 million, or even to ascertain the location and amount of the Debtors' assets, much less liquidate them.

Lacking the funding to do any more than the statutory minimum (and being disinclined to do anything more in the absence of funding), the Liquidator did nothing further. He never did anything as basic as obtaining the Debtors' ledgers and journals. Nor did he secure any bank records that Marex had not already provided to him. He took no steps to ascertain what happened to the $9.5 million. The Liquidator was informed by Marex of the transfer out of the U.K. of the $9.5 million, and the probability—especially given Sevilleja's failure to provide any information as to where the money had gone—of an obvious fraudulent conveyance. But other than sending a single e-mail to Sevilleja (stating—to respond to Marex's criticisms—little more than "I do have a statutory duty to make appropriate enquiries," and that "I should, therefore, be grateful if you could provide me with an explanation"), the Liquidator conducted no investigation and took no action. And when Sevilleja ignored that e-mail, the Liquidator did nothing further.

Though Sevilleja and his associates failed to respond to the Liquidator's e-mail, Sevilleja and other insiders nevertheless were somehow able to, and did, file proofs of claim in the BVI insolvency proceedings they had commenced—for more than $21 million against Creative

Finance, and $22 million against Cosmorex. But the Liquidator took no steps to gauge the legitimacy of these insider claims.

Then, consistent with Sevilleja's plan, the Liquidator filed for chapter 15 relief in the U.S.—which, if recognition as a main proceeding were granted, would provide the benefits of the U.S. automatic stay, and preclude execution by Marex on assets Marex could find in the United States. Though Marex was the Debtors' only non-insider creditor, its judgment enforcement efforts would thereby be blocked. From beginning to end, Sevilleja's tactics were a paradigmatic example of bad faith, and the Liquidator's actions—and inaction—facilitated them.

<u>Findings of Fact</u>[11]

After a multi-day evidentiary hearing, the Court finds the following as facts.

*1. Background*

Creative Finance and Cosmorex, each of which was organized under the law of the BVI in 1995, were primarily engaged in foreign exchange trading, trading through accounts provided by third parties, such as Refco Capital Markets. They conducted most (and probably all)[12] of their business through foreign exchange brokers located outside of the BVI. The Debtors ceased all operations and business well before the commencement of the BVI insolvency proceedings.

The Debtors' current sole director is Jose Blas Perez Alandi, an individual whose address is in Spain. Their sole shareholder is Sevilleja, an individual who does not reside in the BVI, though the record does not reflect whether he spends most of his time in Spain or Dubai.

---

[11]    To avoid unnecessarily clogging this opinion, citations will be limited to the most significant matters. For the most part, citations will not appear for matters set forth in the parties' Joint Statement of Undisputed Material Facts [ECF No. 36] ("**Undisputed Facts**").

[12]    The Liquidator does not contend that the Debtors ever had a COMI in the BVI before his appointment.

## 2. *The Marex Litigation*

Before the BVI insolvency proceedings were commenced, Marex sued each of the two

Debtors under a number of contracts in the High Court of Justice in England, Queen's Bench

Division Commercial Court (the "**English Court**").  The contracts provided that they were

governed by the laws of England and Wales, and contained clauses providing for jurisdiction in

England.  All of the underlying transactions between Marex and the Debtors that gave rise to the

dispute were transactions entered into on Sevilleja's instructions from outside of the BVI.  And

at the time of the BVI insolvency proceedings, the Debtors' only physical presence in the BVI

was through a registered agent and P.O. Box, and the Debtors had no directors, employees or

officers located in the BVI.  But two of the contracts listed the Debtors' "principal place of

business office" in the BVI.[13]

In civil litigation in the English Court, that court may circulate a draft of its ruling in

confidence to the parties prior to issuing a judgment.[14]  As part of this practice, the English Court

also issues orders restraining the parties from any actions to frustrate the announced ruling.[15]  On

July 19, 2013, Mr. Justice Field, the judge presiding over the contract dispute in the English

Court, circulated a draft judgment embodying a ruling against each of the Debtors and in favor of

Marex in an amount in excess of US $5 million (equivalent) plus costs.[16]  The draft contained the

customary language restraining the parties from taking actions in response to the draft judgment

before its formal pronouncement, the breach of which "may be treated as contempt of court."[17]

---

[13]     Undisputed Facts ¶7.

[14]     In England and other commonwealth countries, the term "Judgment" equates to "Opinion" or "Decision" as the latter expressions are used in the U.S.

[15]     Corrected Whelan Decl. dated Apr. 7, 2014 [ECF No. 31] ("**Whelan Decl**.") ¶9.

[16]     *Id.* ¶10.  Under English practice, "costs" generally also include the winner's attorneys' fees, for which the loser is liable.

[17]     *Id.*

On July 26, 2013, the English Court entered an order and judgment (the "**English Judgment**"), consistent with the draft ruling described above.  It set August 8, 2013 as the deadline for amounts due under the English Judgment to be paid by the Debtors to Marex.  The Debtors did not pursue an appeal of the English Judgment and lost the right to do so on September 30, 2013.  To date, the Debtors have not paid to Marex any amounts due under the English Judgment.

Without dispute, in the time between the date the English Court announced the judgment and the date by which the Debtors were directed to pay the judgment amount, over US $9.5 million was transferred from the Debtors' accounts in England to accounts overseas.[18] The inference is inescapable, and the Court finds, that these transfers were orchestrated by Sevilleja in a blatant attempt to avoid payment of the English Judgment.  Through post-judgment discovery in the English litigation, Marex obtained financial records from the Debtors' foreign exchange brokers and financial service providers in England.[19]  Documents were produced by FIXI plc ("**FIXI**"), FXCM Securities Limited ("**FXCM**") and IG Markets ("**IG**"), reflecting Sevilleja's deliberate depletion of liquid assets from the Debtors between June 17, 2013, about a month prior to the date the draft of the English Judgment was circulated, and August 8, 2013, the deadline set by the English Court for payment.[20]

The documents produced by FIXI established that Sevilleja directed the following transfers from Cosmorex's accounts with FIXI in England to an account in Gibraltar:

> (a) US $4 million on July 24, 2013;

> (b) US $2 million on August 1, 2013; and

---

[18]    Undisputed Facts ¶9.  The Undisputed Facts precede this with "Marex alleges…."  This was proven, to the Court's satisfaction, as a fact, not just an allegation.

[19]    Whelan Decl. ¶23.

[20]    Whelan Decl. ¶¶23-31 and Exhs. L-P.

(c) about US $15,000 on August 2, 2013.[21]

The documents produced by FXCM demonstrated that Sevilleja also requested the transfer of funds from Creative Finance's account with FXCM, in the amount of almost US $2.5 million, and Cosmorex's account with FXCM, in an amount in excess of US $1.1 million, to accounts in Dubai.[22] Finally, the documents produced by IG showed that on August 5, 2013, Sevilleja requested that the balance of Cosmorex's account with IG, totaling about US $4,000, be transferred to an account in Gibraltar.[23] The evidence validates Marex's allegations that Sevilleja purposefully moved the Debtors' assets beyond the reach of Marex in anticipation of the English Judgment.

*3. The Refco Claims*

Marex also discovered that after the efforts of Sevilleja to spirit away the liquid assets of the Debtors, the Debtors' only remaining material assets were allowed unsecured claims against the estate of Refco Capital Markets in a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, *In re Refco Inc.*, Case No. 05-60006 (the "***Refco* Case**"), before Judge Drain of this Court.[24] Creative Finance holds a claim in the amount of about US $65 million, and Cosmorex holds a claim in the amount of about US $106 million (together, the "**Refco Claims**").[25] Shockingly—though consistent with the earlier events just described— despite having received an interim distribution in excess of US $1.7 million from the *Refco* Case

---

[21]    Whelan Decl. ¶25 and Exh. L.

[22]    Whelan Decl. ¶¶28, 30 and Exhs. N-P.

[23]    Whelan Decl. ¶27 and Exh. M.

[24]    Undisputed Facts ¶22.

[25]    *Id.* (showing claims against the Refco estate of US $65,445,347 and $105,850,694, respectively).

in August 2013,[26] the Debtors possessed no liquid assets as of the commencement of the BVI

proceedings a few months later.[27]  That $1.7 million had disappeared too.

*4.  The Domestication Proceeding*

      In an attempt to enforce the English Judgment in the U.S. (and in particular, to capture

any future[28] distributions on account of the Debtors' Refco Claims), Marex commenced an

action (the "**Domestication Proceeding**") on August 29, 2013 in the Supreme Court of the State

of New York, County of New York, to have the English Judgment recognized and domesticated

by a New York court.  On October 30, 2013, an order granting Summary Judgment in Lieu of

Complaint was entered in the Domestication Proceeding.  About 10 days later, the New York

County Clerk entered judgments (the "**Domestication Judgments**") against each of the Debtors

in favor of Marex for the full amount of the English Judgment, and counsel for Marex served

notice upon the Debtors.

      On September 6, 2013 (after the Domestication Proceeding had been commenced, but

before the Domestication Judgments had been entered), Marex applied to the High Court of

Justice, British Virgin Islands (Commercial Division) (the "**BVI Court**") to place the Debtors in

liquidation and appoint a liquidator.  On November 18, 2013 (due, Marex says, to cost

implications),[29] Marex withdrew its applications to commence liquidation against the Debtors in

the BVI.  The Liquidator says that Marex's withdrawal was because Marex opted "to seize the

---

[26]    *See* Marex Trial Exhs. 34 (Refco Notice of Fifth Distribution dated July 31, 2013), and 35 (email dated Sep. 25, 2013 from Refco Plan Administrator).

[27]    Tr. of Trial Day 1, Apr. 10, 2014 [ECF No. 38] ("**Trial Day 1 Tr**.") at 29:3-8, 36:21-23, 44:3-18.

[28]    The Liquidator has stated that the Debtors previously received approximately $43 million in interim payments on the Refco Claims.  *See* Liquidator's "First Report to Creditors" (of Creative Finance), in the form of a PowerPoint, dated Feb. 10, 2014 [ECF No. 41-4], at 9 ("**Liquidator PowerPoint**"), attached as Exh. D to Letter to the Court dated June 11, 2014 [ECF No. 41].  What happened to that $43 million is unknown.

[29]    Trial Day 1 Tr. at 109:18-24, 134:19-22.

Debtors' assets for its own benefit" after securing the Domestication Judgments,[30] and the Court

agrees in part; it finds that the last thing Marex wanted was to share the recovery on its

judgments with insiders of the Debtors who might (and later did) file claims against the Debtors'

assets.  But while the Court finds that Marex was undoubtedly attempting to protect its own

interests and to act for its own benefit, the Court further finds that Marex was the Debtors' *only*

non-insider creditor.  The Court further finds that Marex's measures were a response to the

Debtors' machinations, and though Marex can be criticized for inconsistent measures to collect

on its judgments, Marex's actions pale by comparison to the Debtors' outrageous conduct, and

provide no reason for disregarding the latter.

*5.  Debtors' Commencement of BVI Insolvency Proceedings*

       After the Domestication Judgments were entered and served, Marex continued to pursue

efforts to recover on its judgments, now by seeking to effect its judgment execution by

garnishment on further distributions that might thereafter be made on the Debtors' Refco Claims.

In December 2013, Marex entered into a stipulation with the Trustee of the Refco Private

Actions Trust, the Refco Litigation Trust, and the Refco Plan Administrator (the "**December**

**Stipulation**").  Among other things, the December Stipulation directed that future distributions

to which the Debtors would be entitled from the Refco estate would be paid directly to Marex

instead.[31]

       But shortly after Marex served the Domestication Judgments, Sevilleja directed that the

Debtors be put into liquidation in the BVI.  To accomplish that, he issued shareholder's

resolutions on December 12, 2013, which he signed as sole shareholder.  The resolutions

---

[30]     Second Decl. of Liquidator, dated Apr. 4, 2014 [ECF No. 27] ("**Liquidator Apr. 4 Decl.**") ¶33.

[31]     Undisputed Facts ¶29; *see also* Liquidator PowerPoint at 9 ("The Stipulation has since been approved by an order of the US Bankruptcy Court dated 30 December 2013, confirming that any monies paid from the US Bankruptcy Estate of Refco and due to the Company are directed to be turned over to Marex.").

provided for the appointment of the Liquidator—not just any liquidator, but this particular

Liquidator, by name.[32]  Just before his appointment (but on the same day, December 12, 2013),[33]

the Liquidator entered into an indemnity agreement (the "**Indemnity Agreement**") with Creative

Finance Dubai, an entity affiliated with Sevilleja, under which Creative Finance Dubai agreed to

indemnify the Liquidator for his costs and expenses in conducting the BVI insolvency

proceedings.  But the indemnification obligation was unsecured, and the Liquidator had no

realistic means of enforcing it against an entity in Dubai for any costs and expenses not already

advanced or collateralized.  The Liquidator received the initial funding that would allow the

Liquidator to carry out his basic statutory duties[34]—but no more than that.

On December 16, 2013, the Liquidator verbally informed Marex's BVI counsel of his

appointment,[35] and the next day, the Liquidator sent notice of his appointment, as well as

information regarding the first meetings of creditors, to any known creditors.[36]  Despite having

been apprised of the commencement of the BVI insolvency proceedings (and by conduct that

---

[32]     Undisputed Facts ¶11. The resolution for Debtor Creative Finance, for example, signed by Sevilleja, as the "Sole Shareholder," provided, in part:

> WHEREAS, it is proposed that Mr. [Liquidator's name] of [the Liquidator's firm] be appointed as liquidator of the Company with effect from the date of these resolutions … A copy of the written consent of Mr. [Liquidator's name] to act as liquidator of the Company has been examined by the sole member. …
>
> The undersigned, being the sole shareholder of the Company, hereby adopts the following written resolutions:
>
>> the Company be put into liquidation … and
>>
>> Mr. [Liquidator's name] be appointed as liquidator of the Company with effect from the date of the passing of these resolutions.

Appendix to Liquidator PowerPoint.

[33]     *See* Indemnity Agreement ("It is proposed that… the shareholder of the Companies will pass qualifying resolutions… appointing the Liquidator…").

[34]     Liquidator Apr. 4 Decl. ¶12.

[35]     Trial Day 1 Tr. at 81:1-4.

[36]     Decl. of Liquidator, dated Feb. 19, 2014 [ECF No. 6] ("**Liquidator Feb. 19 Decl**.") ¶13.

-13-

troubles this Court, though not as much as the Debtors' conduct and the Liquidator's inaction does), Marex did not, at any point in time, notify the Liquidator of the then-pending negotiation of the Refco Claims December Stipulation.  Rather (by conduct that once again troubles the Court, but once again not as much as the Debtors' conduct and the Liquidator's inaction does), Marex submitted the December Stipulation to the Court in the *Refco* Case for approval without informing Judge Drain of the Debtors' BVI insolvency proceedings.[37]  In fact, the Liquidator did not become aware of the December Stipulation's negotiation and execution until he received a letter from Refco's Plan Administrator on December 27, 2013.[38]

But while the Refco Plan Administrator's letter informed the Liquidator of the pending December Stipulation before Judge Drain, the Liquidator did not object to the approval of the December Stipulation in the *Refco* Case.  On December 30, 2013, with no objections having been filed, Judge Drain so-ordered the December Stipulation.  The Liquidator did not appeal the entry of the order approving the December Stipulation.

*6. Subsequent Proceedings in the BVI*

On January 2, 2014, the Liquidator held the first meetings of creditors at his offices in the BVI.[39]  The minutes of the meetings note that although Marex had submitted proofs of claim in the BVI proceedings, Marex did not submit a proxy or attend those meetings.  The minutes also show that only insiders (or proxies for insiders) attended.[40]

On February 10, 2014, the BVI Court entered an order that:

(i) approved the Liquidator's appointment;

(ii) noted the application of the BVI stay; and

---

[37]    Nerko Aff., dated Apr. 7, 2014 [ECF No. 32] ("**Nerko Aff**.") ¶16.

[38]    Liquidator Apr. 4 Decl. ¶34.

[39]    Liquidator Feb. 19 Decl. ¶13.

[40]    Liquidator Feb. 19 Decl. Exh. C [ECF No. 6-3], at 2, 6.

(iii) "sanctioned" (*i.e.*, authorized) the Liquidator to seek Chapter 15 relief

in this Court.[41]

Additionally, on the same day, a creditors' committee for Cosmorex (the "**Committee**") was

appointed.  It was composed solely of three insiders—Creative Finance Dubai (the same entity

that had executed the Indemnification Agreement); Sarina Management Limited; and Sevilleja

associate Erik Franx.[42]  It has not been disputed that Creative Finance Dubai is an entity related

to the Debtors,[43] and that Sarina Management Limited is controlled by Sevilleja.[44]  Likewise, the

third member of the Committee, Erik Franx, is a former officer of Cosmorex and served as an

assistant to Sevilleja.[45]

Also on February 10, 2014, the Liquidator issued a report (on what appears to be a

PowerPoint) to creditors of the Debtors.  As the Liquidator reported, Marex holds the only non-

insider claim.[46]

As stated by the Liquidator, the total of the claims asserted against Debtor Creative

Finance was about US $29 million,[47] comprised of:

(a)  The insider claim of Sevilleja, in the amount of US $10,720,000, for

"trading commissions";

(b) The insider claim of Creative Finance Dubai, also in the amount of

US $10,720,000, for "advanced funds";[48] and

---

[41]     Undisputed Facts ¶15.  The BVI Court used the word "sanction" to express the authorization it had given.
Because "sanction" is subject to a double entendre in U.S. usage, this Court uses its synonym in that
context, "authorized."

[42]     *Id.* ¶26.

[43]     *See, e.g.,* Liquidator PowerPoint, at 7.

[44]     Whelan Decl. ¶16.

[45]     *Id.*

[46]     *Id.* ¶33; Liquidator PowerPoint; Trial Day 1 Tr. at 107:8-12.

[47]     Undisputed Facts ¶19.

-15-

(c) Marex's claim, said to be in the amount of US $9,447,731.71, for "judgment debt plus costs and interest."[49]

And as stated by the Liquidator, the total of the claims asserted against Debtor Cosmorex was US $32,464,652.43[50] comprised of the following:

(a)  The insider claim of Sevilleja, in the amount of US $16,080,000, for "trading commissions";

(b) The insider claim of Creative Finance Dubai, in the amount of US $3,700,000, for "advanced funds";

(c) The insider claim of Sarina Management Ltd., in the amount of US $2,600,000, for "loan agreement";

(d) The insider claim of Frederik (Erik) Franx, officer and assistant to Sevilleja, in the amount of US $138,000 for "unpaid salary"; and

(e)  Marex's claim, in the amount of US $9,946,652.43, for "judgment debt plus costs and interest."[51]

## 7.  Actions—and Inaction—by Liquidator After His Appointment

With the commencement of the BVI proceedings, the directors and principals of the Debtors ceased to have any power or duties.  Rather, as a matter of BVI law, the Liquidator thereby became the sole manager of the Debtors.[52]  But he did nothing to either manage or liquidate the Debtors other than performing the minimum functions required by BVI statutes[53]—

---

[48]    The coincidence is surprising.  But the Court does not need to make a finding as to whether the claims represent double-counting.

[49]    Undisputed Facts ¶20.

[50]    *Id.* ¶19.

[51]    *Id.* ¶21.

[52]    *See* BVI Insolvency Act section 175(1); Undisputed Facts ¶25.

[53]    Tr. of Oral Argument, July 29, 2014 [ECF No. 54] ("**Arg. Tr.**"), at 76:15 - 79:1.

performing administrative tasks (such as opening bank accounts for the Debtors,[54] and gathering

and preparing required documents[55]), and providing notice of the commencement of the BVI

insolvency proceedings and the appointment of a liquidator to relevant parties;[56] calling for

creditors to file claims;[57] holding the first meeting of creditors;[58] and issuing the formal 60-day

reports.[59]

     After his appointment, and before the filing of the Chapter 15 petitions in this Court, the

Liquidator never collected any assets[60] of the Debtors, nor did he liquidate any assets.[61]  He did

not shut down any businesses of the Debtors,[62] pay any taxes,[63] or bring any causes of action on

behalf of the Debtors' estates.[64]  Nor did he conduct any investigation,[65] despite circumstances

crying out for investigation here.

     Likewise, with the exception of coming to an agreement with Marex's UK counsel on the

fee component of Marex's claim,[66] the Liquidator did not pay or even settle any claims.  In fact,

he told this Court that the claims adjudication process did not move beyond a low-level initial

---

[54]    *Id.*

[55]    *Id.*

[56]    *Id.*

[57]    Liquidator Apr. 4 Decl. ¶22.

[58]    *Id.* ¶27.

[59]    Liquidator Feb. 19 Decl. ¶20.

[60]    Trial Day 1 Tr. at 72:12-19.

[61]    *Id.* at 73:5-6.

[62]    *Id.* at 73:22-23.

[63]    *Id.* at 73:24-25.

[64]    *Id.* at 74:1-13.

[65]    Assuming that writing a single e-mail could be deemed to be "investigation," that single e-mail was written on April 4, 2014, six weeks *after* the chapter 15 case was filed, and only, it appears, as a response to Marex's criticism.  *See infra* n.75.

[66]    Trial Day 1 Tr. at 74:14 - 75:20.  As the winner of the litigation in England, Marex was entitled to "costs," which in English parlance include the winner's attorneys' fees.  The Liquidator negotiated with Marex's counsel to fix the amount of Marex's entitlement to attorneys' fees, but did not pay them.

analysis.[67]  This Court was told that the Liquidator had collected the books and records from

both the director and registered agent of the Debtors, and that his staff had begun an "initial

investigation of the Debtors' liabilities."[68]  But when probed with respect to what he had done

and what he had not, the Liquidator admitted that he had not even collected the Debtors' journals

and ledgers.[69]  The books and records that had been collected were solely those that Marex

provided to him.[70]  The Liquidator did not secure any bank records on his own.

And despite having retained the Liquidator and having initiated the BVI insolvency

proceedings, Sevilleja did not provide the Liquidator with the Debtors' financial records.[71]  Nor

did the Liquidator do anything more than the most minimal steps to get them.  Though it was his

legal obligation to do so, Sevilleja never turned over the Debtors' financial records.[72]

Counsel for the Liquidator explained in oral argument that BVI law provides for

consequences for failing to produce the documents.  And he explained that under BVI law, "if

you don't fulfill your obligations, you get fined."[73]  But then:

> THE COURT:  What steps did he [the Liquidator]
> take to ask the BVI court to impose the fine or to subject
> Sevilleja to contempt or other legal processes for failure to
> comply?
>
> [COUNSEL FOR LIQUIDATOR]:  He has not
> approached the BVI court regarding that, Your Honor.[74]

---

[67]   *Id.* at 74:7-21.

[68]   *See* Liquidator Apr. 4 Decl. ¶¶22, 25, 26.

[69]   Tr. of Trial Day 2, June 24, 2014 [ECF No. 50] ("**Trial Day 2 Tr.**"), at 47:14 - 49:12.

[70]   The Liquidator's counsel acknowledged that throughout the entirety of the time in which Debtors' COMI
assertedly moved from Spain, Dubai, or England to the BVI by reason of the Liquidator's activities in the
BVI, "less than 100 hours of work was billed by petitioner."  Arg. Tr. at 16:7-19.  The explanation was
"that a significant amount of work was conducted in less than 100 hours."  *Id.*

[71]   Trial Day 1 Tr. at 63:5 - 65:24.

[72]   *Id.*; Trial Day 2 Tr. at 47:14 - 49:12.

[73]   Arg. Tr. at 57:20.

[74]   *Id.* at 58:14-18.

Further evidencing his failure to manage the Debtors' affairs after his appointment was the Liquidator's inaction with respect to the $9.5 million of missing assets.  After receiving a list of the accounts, dates, and amounts of the transfers from Marex (and not by his own effort), the Liquidator's only attempt to collect more information was the dispatch of a single e-mail, to "Carlos" and his associates—remarkable for its purpose (to respond to Marex's criticisms); for its timidity; for its lack of concern (if not also outrage) over what the individuals who had retained him had done; for its focus on ensuring no more than that his "duties are fulfilled"; and for its lack of follow-up.  In that e-mail, sent to the Debtors' directors and principals, including Sevilleja, on April 4, 2014, the Liquidator stated:

> As part of its objections, Marex has raised a number of criticisms.  Some of which have been levied against the relationship between the Liquidator and the so-called "insider" creditors, some of which are levied against Carlos and his related entities and more specifically their conduct around the time judgment was issued in the UK Courts— effectively that assets were transferred out of the estates at a time when Carlos was made aware that a judgment was pending in favour of Marex.  I suspect that these criticisms come as little surprise to you as I understand that they have been aired in the UK Court process.
>
> Whilst my counsel and I are robustly dealing with the former criticisms and remain confident that we will obtain Chapter 15 recognition next week, I do have a statutory duty to make appropriate enquiries regarding the latter points.  I should, therefore, be grateful if you could provide me with an explanation of the activities of C&C around the time that the UK judgment was handed down so that I can ensure my duties are fulfilled (the period that Marex seems most concerned about being 19th July 2013 to 14th August 2013).[75]

---

[75]    Liquidator's email dated April 4, 2014, Exh. P of Petitioner's Amended Evidence List for trial.

In response to questioning focusing on the substance and tone of that e-mail, the
Liquidator conceded that his e-mail was "benign."[76] But he asserted that it was a strategic
attempt to begin a dialogue with Sevilleja.[77] If that is true, the Court is astounded by the lack of
action following that supposed beginning. Sevilleja, perhaps not surprisingly, never responded.
And the Liquidator never did anything further—not by way of subpoena, not by way of letter,
not even by picking up the phone.[78] And at the trial on this contested petition for recognition, the
Liquidator made it clear that without further funding, he would not pursue an investigation into
the fraudulent transfer claims.[79]

Though Sevilleja and his associates failed to respond to the Liquidator's e-mail, Sevilleja
and other insiders nevertheless were able to, and did, file proofs of claim in the BVI insolvency
proceedings they'd commenced—for more than $21 million against Creative Finance, and
$22 million against Cosmorex. But the Liquidator took no steps to gauge the legitimacy of those
insider claims.

Upon its review of the entirety of the evidence, the Court finds that the Liquidator did no
more than the bare minimum necessary to comply with his statutory duties, if that, and that the
limited activities he undertook fell far short of being sufficient to justify a finding that the
Debtors' COMI moved to the BVI. If compliance with the bare minimum necessary to comply
with statutory duties nevertheless required material effort, the Court could then find that the

---

[76] Trial Day 2 Tr. at 28:17-19.

[77] Trial Day 2 Tr. at 29:1-5.

[78] Similarly, in his February Liquidator PowerPoint, there was no mention of the missing $9.5 million, or of the movement of the Debtors' funds out of the U.K. Claims that might exist with respect to the missing funds were not mentioned in the Liquidator's discussion of "Assets" (though the claims in the *Refco* Case were discussed at length), and the section on "Next Steps" made no mention of any future investigation (much less litigation) with respect to the missing $9.5 million.

[79] *See* Trial Day 1 Tr. at 59:20-24; Trial Day 2 Tr. at 35:15-24.

COMI had changed.  But the activities here fell far short of anything that could legitimately be characterized as "material effort."

Though managing a liquidation requires less effort than running an active business, here even the most basic activities—such as getting bank records, ledgers, journals and back-up documents for cash receipts and expenditures—were not undertaken.  Nor were available financial records analyzed except in the most perfunctory manner.  And the failure to pursue, by more than a single, hesitant e-mail, the disappearance of $9.5 million—the entirety of the Debtors' liquid assets—further reinforces the Court's finding of how minimal the Liquidator's efforts were here.

It is possible that the reason the Liquidator did so little here was that Sevilleja and his associates failed to cooperate and ensure payment for the work that had to be done.  But without needing to make a finding as to whether, as a matter of professionalism or BVI law, the work should have been done anyway, the Court finds simply that it *was not done*.

## 8. *Factual Findings re Liquidator's Management of the Debtors*

The Court expresses no view as to whether the Liquidator's conduct was or was not sufficient, under BVI law, to ensure that his "duties [were] fulfilled."  That is a matter for the BVI courts.  But this Court finds as a fact that the Liquidator never managed the Debtors' business, nor took the necessary steps to liquidate them, in any material way—and, as a finding of fact, that his efforts were so minimal that the Debtors' COMI never shifted from Spain, Dubai, or (possibly) England, where Sevilleja actually did business,[80] to the BVI.

---

[80]     *See* Whelan Decl. ¶14 (quoting finding by Mr. Justice Field of the English Court that Creative Finance and Cosmorex were BVI companies owned and controlled by Sevilleja, a "self-employed businessman based in Dubai and Valencia, Spain"); and ¶15 (quoting Sevilleja's witness statements to the English Court that he incorporated each of Creative Finance and Cosmorex in the BVI "on the advice of a tax lawyer," and that he conducted business through foreign exchange brokers, "most of whom were in London.").

Likewise, the Court finds that just as the Liquidator failed to do enough to manage the Debtors so that their COMI would change, he failed to do enough to support a finding that the Debtors had an "establishment" in the BVI. The Debtors never conducted any nontransitory economic activity in the BVI; did not conduct business in the BVI; and never had a seat for local business activity in the BVI.

### 9. Proceedings in this Court

The Liquidator filed this chapter 15 case on February 19, 2014, about two months after the December 12, 2013 date on which the Debtors had issued resolutions appointing him and the December 12, 2013 date of the Indemnity Agreement, and nine days after the February 10, 2014 date his appointment had been approved by the BVI Court. On the same day that this chapter 15 case was filed, the Liquidator sought recognition in this Court of the BVI insolvency proceeding as a foreign main proceeding, or, alternatively, as a foreign nonmain proceeding.

The chapter 15 case was filed here *before* the Liquidator had made any investigation, or any inquiry at all, with respect to the missing funds. As noted above, his one and only inquiry to Sevilleja about the missing funds was made by e-mail dated April 4, 2014, *about six weeks after* the chapter 15 filing in this Court.

In March 2014, Marex and the Liquidator learned that further distributions might be forthcoming soon thereafter in the *Refco* Case.[81] Marex desired to capture *Refco* Case distributions to satisfy its judgments, and the Liquidator advised the Court of his possible desire to seek a TRO, or other section 1519 interim relief, to prevent payments from going to Marex

---

In material part by reason of Sevilleja's radio silence in either the BVI or this Court, the record is insufficiently developed to ascertain whether the Debtors' COMI before their BVI filing was in Spain, Dubai, or (by reason of the foreign exchange brokers through whom the Debtors did business) England. Most assuredly, the COMI was not in the BVI.

[81]    *See* Tr. of Conference, Mar. 5, 2014 [ECF No. 19] ("**Mar. 5 Conf. Tr.**"), at 7:11 - 9:25, 16:1-20.

until the Liquidator's request for recognition, then scheduled to be heard on March 26,[82] was

decided.  At a status conference on March 5, 2014, it was determined that a three-way stipulation

would be drafted providing that if and when the Refco estate made any further distributions to

the Refco creditor community, it would pay those distributions into the registry of the Court, and

get the same kind of dispensation that a stakeholder would get in an interpleader action.[83]  If

approved, the stipulation would then be so-ordered by each of this Court and Judge Drain.[84]  It

would preserve the status quo through the time the Court ruled on recognition.[85]

The contemplated stipulation (the "**Standstill Stipulation**") was thereafter executed and

so-ordered by each of this Court and Judge Drain.[86]  It provided, in accordance with the Court's

earlier direction, that further distributions on the Refco Claims would be deposited into the

Court's registry.  The Court's records reflect that four such distributions (two for each of the two

Debtors) were thereafter placed in the Court's registry, and that the Court now holds a total of

$1,744,678.80—with $692,590.56 having been received on the *Refco* claims of Debtor Creative

Finance, and $1,052,088.24 on the *Refco* claims of Cosmorex.

---

[82]     *See* ECF No. 12.

[83]     *Id.* at 17:11-24, 30:24 - 31:21.

[84]     *Id.* at 19:12-25.  At the March 5 Conference, Marex also made the point that as a judgment creditor, it
might turn out to be secured—which, if true, might give it priority not just over insiders, but ordinary
unsecured creditors as well.  *See id.* at 13:4-14.  This was potentially important because at the outset of the
hearing, the Court assumed that, in addition to Marex, there were other noninsider creditors, as there had
been in all of the other chapter 15 cases on the Court's watch.  But Marex clarified that here there were no
other noninsider creditors at all.  *See id.* at 27:10-19.

[85]     *Id.* at 19:12-25.

[86]     *See* ECF No. 25 in this case.  It was also filed in the *Refco* Case (Case No. 05-60006 (RDD), ECF No.
7227).

*10. Factual Findings re Bad Faith*

The Court further finds, as a fact, should it ever become material in any proceedings to follow,[87] that Sevilleja and his associates—and hence the Debtors—were guilty of bad faith in numerous respects.  They included, without limitation (wholly apart from moving the $9.5 million in Debtor assets out of the U.K. in the face of an imminent adverse ruling from the English Court), attempting (unfortunately, successfully) to control a BVI liquidator, who was supposed to act as an independent fiduciary, by the purse strings; failing to respond to the Liquidator's inquiries; depriving the Liquidator of the resources he needed to properly do his job; and orchestrating this entire chapter 15 case to deprive their only noninsider creditor of much or all of the fruits of its judgments.[88]

## Discussion

The Liquidator, as the foreign representative of Debtors Creative Finance and Cosmorex, seeks recognition by this Court of the Debtors' BVI foreign proceedings in the U.S. as a "foreign main proceeding," under section 1517(b)(1) of the Bankruptcy Code or, alternatively, as a "foreign nonmain proceeding" under section 1517(b)(2).  The Debtors' sole non-insider creditor Marex opposes this request; Marex asserts that recognition should be denied:

(i) for failure to meet chapter 15's statutory standards, and

(ii) on public policy grounds, by reason of the Debtors' bad faith, and the Liquidator's actions in furtherance of the Debtors' goals.

---

[87] The Court does not need to find bad faith to deny recognition here.  As addressed in the legal discussion to follow, the Court is denying recognition as a foreign main proceeding by reason of the Liquidator's failure to establish a COMI in the BVI.  And the Court is denying recognition as a foreign nonmain proceeding because of the Liquidator's failure to establish the presence of even an establishment in the BVI.  But if future proceedings in this case should ever turn on the Debtors' good faith or bad faith, the Court regards it as important to make its views on that, after hearing the evidence, perfectly clear now.

[88] The Court further finds, as a conclusion of law, that irrespective of the Liquidator's intent, the Debtors' bad faith is imputed to the Liquidator.  *See infra* n.145.

Marex also seeks dismissal, under section 305, by reason of the Debtors' bad faith, and as addressed in the post-argument briefing, seeks alternative relief that would address the Debtor abuses by means other than section 305.

The Court addresses these in turn.

I.

Recognition

A.  *The Statutory Scheme*

Section 1517 of the Bankruptcy Code provides, in relevant part:

> (a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
>
> > (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
> >
> > (2) the foreign representative applying for recognition is a person or body; and
> >
> > (3) the petition meets the requirements of section 1515.
>
> (b) Such foreign proceeding shall be recognized—
>
> > (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
> >
> > (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

"Upon recognition of a foreign main proceeding, Section 1520 provides certain automatic, nondiscretionary relief, including an automatic stay of all proceedings against the

debtor in the United States."[89]  A discretionary stay is also available under section 1521 of the

Code, regardless of whether a foreign main proceeding is recognized.[90]

Finally, section 1506 provides an "overriding public policy exception to all of Chapter

15…"[91]  Section 1506 provides that:

> Nothing in this chapter prevents the court from refusing to
> take an action governed by this chapter if the action would
> be manifestly contrary to the public policy of the United
> States.

Thus, subject to any constraints section 1506 might impose, recognition, by reason of

section 1517(a)'s use of the word "shall," is mandatory in instances in which the requirements of

section 1517 have been satisfied.[92]

But recognition is not a "rubber stamp exercise,"[93] and the ultimate burden of proof for

each of section 1517's requirements is on the foreign representative.[94]  For speed and

convenience in instances in which the COMI is obvious and undisputed,[95] section 1516(c)[96]

provides a presumption that the COMI is the place of the debtor's registered office, though this

---

[89]    *Fairfield Sentry*, 714 F.3d at 133, paraphrasing section 1520(a).

[90]    *Id.*, paraphrasing section 1521(a).

[91]    *Id.*, quoting section 1506.

[92]    *See In re Millard*, 501 B.R. 644, 653-54 (Bankr. S.D.N.Y. 2013) (Gerber, J.) ("*Millard*").  In *Millard* (a case in which this Court *did not* find bad faith), this Court expressed its view that bad faith alone could not result in a denial of recognition, starting with the textual analysis with which this Court starts here.  It stated:

> Because section 1517(a) is preceded by the word *shall,* it takes away
> judicial discretion from me in the first instance.  That is not necessarily
> the end of the inquiry—because after recognition has been granted,
> section 305 provides additional mechanisms for changing that—but
> section 1517(a) imposes a mandatory requirement, in the first instance,
> for recognition when its requirements have been met.  *Id.*

[93]    *See*, *e.g.*, *Bear Stearns-District*, 389 B.R. at 335; *Basis Yield* ,381 B.R. at 40; *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 332 (Bankr. D. Del. 2010) (Gross, J.).

[94]    *See Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010) ("***Ran-Circuit***").

[95]    *See, e.g., Basis Yield*, 381 B.R. at 52.

[96]    Section 1516(c) provides, in relevant part, that "[i]n the absence of evidence to the contrary, the debtor's registered office … is presumed to be the center of the debtor's main interests."

presumption is rebuttable.[97]  Section 1516(c) "does not tie the hands of a court to examine the

facts more closely in any instances where the court regards the issues to be sufficiently material

to warrant further inquiry."[98]  And in that event, the petitioner still has the burden of

persuasion.[99]

For the finding of an "establishment" that is a requirement for finding a nonmain

proceeding, there is no comparable presumption,[100] and the existence of an "establishment" must

be established by evidence, with the petitioner once again having the burden.[101]

### B.  Effect of section 1506

As noted, section 1517's "statutory mandate" is subject to a public policy exception,

embodied in section 1506, which permits a court to refuse recognition 'if the action would be

manifestly contrary to the public policy of the United States.'"[102]  But even though, as discussed

above, the Court has found bad faith on the part of the Debtors (and though that bad faith must

be imputed to the Liquidator, even if he was not trying to assist the individuals who had retained

him), and even though anything this Court might do to facilitate the Debtors' conduct could

legitimately be said to be contrary to U.S. public policy, the Court does not consider it

appropriate to invoke section 1506 under the facts present here.

---

[97]    *See Fairfield Sentry*, 714 F.3d at 137.

[98]    *Basis Yield*, 381 B.R. at 52.

[99]    *See id.* at 53 ("A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.").

[100]   *See British American-Recognition*, 425 B.R. at 915 ("Unlike with the determination of COMI, chapter 15 provides no evidentiary presumption in connection with the determination of whether a debtor has an establishment in a particular jurisdiction").

[101]   *See id.* ("The petitioner has the burden of proof on whether a debtor has an establishment in the country of the foreign proceeding.").

[102]   *Fairfield Sentry*, 714 F.3d at 137.

The Court comes to that view for several reasons.  First, while U.S. courts have scrutinized the *goals* of a party,[103] or the fairness of a foreign judicial system or the substance of its laws,[104] in considering the section 1506 public policy exception, the Court has seen no precedent applying that exception to the misbehavior of a party alone.  The Court has been faced with bad faith filings in U.S. chapter 11 cases as well, and while it has repeatedly taken action to deal with the abusers, it has not elevated its concerns as to the debtor misconduct to the level of public policy.  It does not seem right to find a violation of U.S. public policy when U.S. debtors sometimes engage in the same or similar bad faith, under U.S. law.

The text of section 1506 requires that denial of rights available under chapter 15—including recognition—be confined to instances where granting those rights would be *manifestly* contrary to the public policy of the U.S.  "The statutory wording requires a narrow reading" of that exception.[105]  As this Court noted in *Millard*, the exception "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States."[106]

---

[103]    *See, e.g., Millard*, 501 B.R. 644, though in that case this Court found that the *Millard* debtors' goals (to commence litigation in U.S. nonbankruptcy courts to challenge a default judgment taken against them, without first bonding the judgment) were not violative of U.S. public policy.  This Court stated:

> Nor, even if one looks at the issues more broadly, has the Marianas shown any exceptional circumstances concerning matters of fundamental importance to warrant invoking section 1506 to deny recognition.  No showing has been made that the Caymans' insolvency law is in any way repugnant to U.S. law.  Likewise, no showing has been made that Cayman's procedural protections for creditors vary materially from U.S. insolvency law, much less that they are repugnant to U.S. law.

*Id.* at 651-52.

[104]    Here, concerns of the latter character are not present.  No showing has been made that the BVI courts dispense justice in a way materially different than U.S. courts do; to the contrary, the two nations' systems share similar values, and seek to implement those values in largely similar ways.

[105]    *Fairfield Sentry*, 714 F.3d at 139; *accord Ran-Circuit*, 607 F.3d at 1021.

[106]    501 B.R. at 651 (*quoting Ran-Circuit*, 607 F.3d at 1021).  *See also Iida v. Kitahara* (*In re Iida*), 377 B.R. 243, 259 (B.A.P. 9th Cir. 2007) ("This public policy exception is narrow and, by virtue of the qualifier

As offended as the Court is by the Debtors' conduct here, the Court believes that section 1506 is inappropriately invoked to deal with it.  On the facts here, whether recognition is appropriate (as either a foreign "main" or "nonmain" proceeding) turns on compliance with the requirements of section 1517 alone.

## C.  Requirements of section 1517

As noted above, in instances in which section 1506 does not justify a different result, recognition is mandatory when each of the requirements of section 1517(a) has been satisfied. Plainly the Liquidator has satisfied two of the three requirements—subsections (2) and (3)—of section 1517(a).[107]  But under the facts as the Court has found them here, the Liquidator has not satisfied the requirements of subsection (1), wholly apart from the Debtors' bad faith.

Section 1517(a)(1) requires the Court to find that the BVI proceedings are foreign "main" proceedings or "nonmain" proceedings within the meaning of Bankruptcy Code section 1502. Marex contends that the Debtors' BVI proceedings do not qualify as either because the Debtors do not have their COMI in the BVI (as required for a "main" proceeding finding), or an "establishment" in the BVI (as required for a "nonmain" proceeding finding).  The Court agrees.

### 1.  "Main" Proceeding

A "foreign main proceeding" is defined in section 1502(4) as a "foreign proceeding pending in the country where the debtor has the center of its main interests."  Though as noted, the Code establishes a presumption, under section 1516(c), for the determination of COMI that

---

'manifestly,' is limited only to the most fundamental policies of the United States"); *In re Ephedra Prods. Liability Litig.,* 349 B.R. 333, 336 (S.D.N.Y. 2006) (Rakoff, J.) ("In adopting Chapter 15, Congress instructed the courts that the exception provided therein for refusing to take actions manifestly contrary to the public policy of the United States should be narrowly interpreted, as [t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.") (internal quotations omitted).

[107]     Since the Liquidator is a "person" within the meaning of section 101(41) and a "foreign representative" by the definition of section 101(24), the standards of 1517(a)(2) have been met.  Complying with 1517(a)(3), the Liquidator has fulfilled the petition requirements delineated in section 1515.

can be used in easy cases, that presumption is rebuttable, and the Court's hands are not tied when the issues are sufficiently material to warrant further inquiry.[108]  Thus reliance on the presumption is especially inappropriate in a case where there is a substantial dispute.[109]  Given the evidence the Court heard here, strongly leading to a contrary conclusion, the Court cannot rely on the presumption.

"Chapter 15 does not define COMI,"[110] nor is COMI defined elsewhere in the Code, such as in chapter 1, where most of the Code's definitions can be found.  Nor does the Code prescribe the type of evidence that should be considered in a COMI analysis.  Because COMI is not statutorily defined, courts are free to develop and consider the particular factors that may be relevant, dependent upon the facts and circumstances present.[111]  In his decision in *SPhinX-Bankruptcy*,[112] Judge Drain of this Court identified factors courts might look to in making a COMI determination.  He stated:

> Various factors, singly or combined, could be relevant to such a determination:  the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.[113]

---

[108]   *See supra* n.98.

[109]   *See SPhinX–District,* 371 B.R. at 18 (quoting *SPhinX–Bankruptcy,* 351 B.R. at 117, which in turn had quoted the House Report, H.R.Rep. No. 109–31, pt. 1, at 112–13 (2005), U.S. Code Cong. & Admin. News 2005, pp. 88, 175) ("The legislative history [ ] indicates that the statutory presumption of § 1516(c) may be of less weight in the event of a serious dispute:  '[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.'").

[110]   *Fairfield Sentry,* 714 F.3d at 133.

[111]   *See id.* at 138.

[112]   351 B.R. 103

[113]   *Id.* at 117.

In *Fairfield Sentry*, the Circuit quoted Judge Drain's "widely adopted list of COMI factors" approvingly—noting also, however, Judge Drain's "warning … against mechanical application."[114]  And further to that latter idea, the Circuit added that "[t]his exclusive list is a helpful guide, but consideration of these specific factors is neither required nor dispositive."[115] Any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis.[116]

The "relevant principle," as the Second Circuit explained in *Fairfield Sentry,* "is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties."[117]  "A COMI that is regular and ascertainable is not easily subject to tactical removal."[118]

In *Bear Stearns*, Judge Lifland denied foreign "main" recognition, and in *Basis Yield*, this Court found material issues of fact as to the propriety of foreign "main" recognition (notwithstanding the section 1516 presumption) with respect to Cayman liquidation proceedings where recognition was sought virtually immediately after the filing of the proceedings in the Cayman Islands.  In each of those cases, the Cayman Islands was a letterbox jurisdiction.  The evidence showed (or at least strongly suggested) that the foreign debtors had been organized under Cayman law for tax[119] or regulatory reasons; had principal places of business elsewhere in the world before their Cayman filings; and had done little or no business in the Cayman Islands

---

[114]    *Fairfield Sentry*, 714 F.3d at 137.

[115]    *Id.* at 138.

[116]    *Id.* at 137.

[117]    *Id.* at 129.

[118]    *Id.* at 137.

[119]    Likewise, Sevilleja told the English Court that he had incorporated the Debtors in the BVI "on the advice of a tax lawyer."  *See supra* n.80.

before U.S. recognition was sought—impairing the U.S. courts' ability to find that the debtors'

COMIs had shifted from the nations where they previously did business to the Cayman Islands.

But after *Bear Stearns* and *Basis Yield* were decided, the Second Circuit held, in *Fairfield*

*Sentry*, that the relevant time for measuring COMI is the time at which the U.S. chapter 15

petition was filed—not the earlier time at which the foreign insolvency proceeding was

commenced.[120]  The effect of that holding is that in instances in which a foreign representative

has engaged in significant pre-U.S. filing work to operate (or even liquidate) the foreign debtor

in the jurisdiction where the foreign insolvency proceeding was commenced (even if in a

letterbox jurisdiction), the COMI can be found to have shifted from the foreign debtor's original

principal place of business to the new locale.  Though *Fairfield Sentry*'s holding would not have

made a difference in *Bear Stearns* or *Basis Yield* (because each was filed in the U.S. virtually

immediately after the Cayman filing), *Fairfield Sentry* now provides a means for U.S.

recognition of letterbox jurisdiction insolvency proceedings—so long as the estate fiduciaries in

those jurisdictions do enough work.

And since *Bear Stearns* and *Basis Yield* were decided, foreign representatives from

letterbox jurisdictions (such as the Cayman Islands and BVI) have increasingly frequently filed

their U.S. chapter 15 cases *after* they had undertaken substantial work in their letterbox

jurisdictions.  In such cases, courts in this district—including Judge Lifland, the author of *Bear*

*Stearns-Bankruptcy*, and this Court, the author of *Basis Yield*, have readily granted recognition to

proceedings emanating from letterbox jurisdictions based on the foreign representatives' material

efforts to manage or liquidate their debtors' businesses before coming to the U.S.

---

[120]     714 F.3d at 133-34**.**

But apart from ruling that it would be the state of affairs at the time of chapter 15 filing that matters for COMI purposes, and discussing the standards for finding a COMI, *Fairfield Sentry* sent still another important message.  The Circuit noted the "concern about possible COMI manipulation,"[121] and ruled that a court "may look at the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith."[122]  Though the relevant time for the determination of COMI is the time of the chapter 15 petition, it is "subject to an inquiry as to whether the process has been manipulated."[123]  That caveat was important enough to get across that the *Fairfield Sentry* court mentioned it, one way or another, *seven times*.[124]

As Judge Lifland recognized in *Fairfield Sentry* in his decision that later was affirmed first by the District Court and then by the Circuit, when a foreign representative relocates all of the primary business activities of a debtor to his or her location, the COMI may "become lodged with the foreign representative."[125]  Judge Lifland thus granted foreign main proceeding

---

[121]     *Id.* at 137.

[122]     *Id.* at 138.

[123]     *Id.* at 129.

[124]     *See id.* at 129 ("the relevant time period is the time of the Chapter 15 petition, *subject to an inquiry into whether the process has been manipulated*"); *id.* at 133 ("[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition."); *id.* at 137 ("[t]hese interpretations also reflect a concern about possible COMI manipulation…. A COMI that is regular and ascertainable is not easily subject to tactical removal."); *id.* at 137 ("But given the EU Regulation and other international interpretations, which focus on the regularity and ascertainability of a debtor's COMI, a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition *to ensure that a debtor has not manipulated its COMI in bad faith*"); *id.* at 138 ("[a] court may look at the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition *to ensure that a debtor has not manipulated its COMI in bad faith*"); *id.* at 139 (the bankruptcy court's factual findings supported the conclusion "that Sentry's COMI was in the BVI at the time of the Chapter 15 petition, and that Sentry *did not manipulate its COMI in bad faith* between the initiation of the BVI proceeding and the filing of the Chapter 15 petition"); *id.* ("True, the relevant time period was when the Chapter 15 petition was filed (*with a look backward to thwart manipulation*)") (emphasis added in each case).

[125]     *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 65 (Bankr. S.D.N.Y. 2010) (Lifland, C.J.) ("***Fairfield Sentry-Bankruptcy***"), *aff'd* 2011 U.S. Dist. LEXIS 105770, 2011 WL 4357241 (S.D.N.Y. Sep. 16, 2011) (Daniels, J.) ("***Fairfield Sentry-District***"), *aff'd in Fairfield Sentry, supra* n.1.

recognition in *Fairfield Sentry-Bankruptcy*;[126] Judge Kimball did so in *British American-Recognition*[127] (for one of the two foreign proceedings whose affairs he needed to consider[128]) and in *Isle of Venice-Recognition*;[129] and this Court did so with respect to several of the letterbox jurisdiction chapter 15 filings on its watch.[130]

But here, the Court has found that the Liquidator's efforts were so minimal that the Court cannot find the necessary change in COMI. In the two months between the time Sevilleja retained him and the time he filed his chapter 15 case in this Court, the Liquidator failed to do the basic things that can under normal circumstances cause a change in COMI—even in a liquidation.

### 2. *"Nonmain" Proceeding*

The Court likewise concludes that it cannot find the BVI proceeding to be a nonmain proceeding either, though for slightly different reasons. The Debtors never had an "establishment" in the BVI before the Liquidator was retained, and the types of things the

---

[126]    *Fairfield Sentry-Bankruptcy*, 440 B.R. at 67.

[127]    425 B.R. at 916.

[128]    He could not make that finding with respect to the Bahamian proceeding, however. *Id.*

[129]    441 B.R. at 716.

The Liquidator also relies on *In re Betcorp. Ltd.*, 400 B.R. 266 (Bankr. D. Nev. 2009) (Markell, J.) ("**Betcorp**"), but *Betcorp* adds little to the analysis. There, a company with its principal place of business in Australia (whose "administrative and executive nerve center" was in Australia, whose securities were publicly traded in Australia, and 91% of whose shareholders were in Australia), filed an insolvency proceeding in Australia and the appointed liquidator sought Chapter 15 recognition as a foreign main proceeding. The *Betcorp* court found that "When the company was first formed, its sole subsidiary operated only in Australia. As the company grew, it began to operate subsidiaries in other countries, giv[ing] rise to 'interests' in each place it did business." *Id.* at 293. But the *Betcorp* court found that "at all times Betcorp's administrative and executive nerve center was Australia. It is where its decisions were made and where most of its management and shareholdings were concentrated…. Therefore, the court's decision on Betcorp's COMI would not be changed by taking into account the operational history of the company." *Id.* It is no wonder that the *Betcorp* court found the debtor's COMI to be in Australia.

[130]    *See In re Farenco Shipping Co. Ltd.*, Case No. 11-14138-reg (BVI); *In re China Medical Technologies, Inc.*, Case No. 12-13736-reg (Cayman Islands); *In re ICP Strategic Credit Income Fund Ltd.*, Case No. 13-12116-reg (Jointly Administered) (Cayman Islands); *In re FIA Leveraged Fund (In Liquidation)*, Case No. 14-1009-reg (Cayman Islands); *In re Fletcher Income Arbitrage Fund Ltd. (In Liquidation)*, Case No. 14-10094-reg (Cayman Islands); *In re Richcourt Euro Strategies Inc., et al.*, Case No. 15-12273-reg (Jointly Administered) (BVI).

Liquidator did (and, for that matter, did not do) were not of the type that could permit an "establishment" to be found.

The term "foreign nonmain proceeding" is defined in the Code. It means "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."[131] "Establishment," unlike COMI, is likewise defined in the Code. "Establishment" means any place of operations where the debtor carries out a nontransitory economic activity.[132] "Establishment" has been described as a "local place of business."[133]

To have an establishment in a country, the debtor must conduct business in that country.[134] "The location should constitute a 'seat for local business activity' for the debtor."[135] The terms "operations" and "economic activity" require a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.[136]

In *British American-Recognition*, Judge Kimball found that British American Insurance lacked an establishment in the Bahamas. It was undisputed that the debtor there "had no

---

[131]   *See* section 1502(5); *British American-Recognition,* 425 B.R. at 914-15 (explaining the statutory scheme as applicable to nonmain proceedings, and then going on to address the caselaw).

[132]   Section 1502(2). *See also British American-Recognition,* 425 B.R. at 914-15 (noting this next in its analysis).

[133]   *British American-Recognition*, 425 B.R. at 914-15 (quoting *Bear Stearns-Bankruptcy,* 374 B.R. at 131). As Judge Kimball went on to explain:

> To further define establishment, courts look to the Model Law and the sources used to promulgate it. "Per the [European Union's Convention on Insolvency Proceedings]'s legislative history, a 'place of operations' referred to 'a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional.'"

*Id.* (*quoting Lavie v. Ran,* 406 B.R. 277, 284 (S.D. Tex. 2009) ("***Ran-District***"), which in turn had cited Council, Report on the Convention on Insolvency Proceedings, at 49, No. 6500/96).

[134]   *See British American-Recognition,* 425 B.R. at 915.

[135]   *Id.* (quoting *In Bear Stearns-Bankruptcy*, 374 B.R. at 131).

[136]   *Id.*

-35-

business operation in the Bahamas other than the judicial manager's activities pursuant to his

appointment."[137]  And the estate fiduciary's "retention of counsel and accountants, investigation

of assets and liabilities, and reporting to the Bahamas Court did not constitute business activities

of [British American Insurance]."[138]  He further observed that in *Bear Stearns-District,* Judge

Sweet had rejected the same argument—that these kinds of things showed an establishment in

the Cayman Islands[139]—and observed that the *Ran-District* court came to the same view.[140]

The Court reaches the same conclusions as to the failure to show an establishment in the

BVI that the courts in *Bear Stearns-District*, *Ran-District*, and *British American-Recognition* did.

Here, there was no nontransitory business activity in the BVI, and thus the Liquidator did not

make a showing of an "establishment" in the BVI.  The Court cannot grant recognition as a

foreign nonmain proceeding either.

---

[137]      *Id.*

[138]      *Id.*

[139]      *Id.* (*citing Bear Stearns-District*, 389 B.R. at 339).

[140]      *Id.* (*citing Ran-District*, 406 B.R. at 286 ("From the outset, it stretches credulity to view a bankruptcy proceeding as an industrial or professional activity.... Further, though a bankruptcy proceeding does pertain to economic matters, it does not comport with traditional notions of economic activity in the marketplace.")).

In fact, Judge Kimball noted that as the *Ran-District* court had observed, finding an establishment based solely on the existence of an insolvency proceeding poses two problems:

> First, by definition, an insolvency proceeding is a transitory action. Transitory actions are tied to the person, rather than a location.  In stark contrast, the concept of establishment is location-oriented, in that it focuses on the "place of operations" in which the activity occurs. It would seem an odd result to permit a transitory action to suffice as the basis for finding nontransitory economic activity.

> Second, if the proceeding and associated debts, alone, could suffice to demonstrate an establishment, it would essentially rule out the possibility that any proceeding would fall into the third, more nebulous category of proceedings that are neither foreign main nor foreign nonmain.  But, this third category was clearly envisioned by the drafters.  Therefore, such an interpretation would be contrary to statutory intent and thus violate a key canon of statutory interpretation.

*British American-Recognition*, 425 B.R. at 915 (*quoting Ran-District*, 406 B.R. at 286-87) (internal citations omitted).

## II.

## The Alternative Arguments

*A.*     *Use of Section 305*

Perhaps in part because this Court suggested, in *dictum*, in its opinion in *In re Millard*,[141]

that section 305 of the Code[142] might be available to address debtor bad faith,[143] Marex asked

this Court to rule that this case should be dismissed for that reason.  Ultimately, the Court does

not need to decide the issue, as the Court is denying recognition for failure to establish a COMI

(or, for that matter, an establishment) in the BVI.  Thus there would be no continuing chapter 15

case to dismiss in any event.

---

[141]     *See Millard,* 501 B.R. at 652-53 & n.33.

[142]     Section 305 of the Bankruptcy Code provides:

>      (a) The court, after notice and a hearing, may dismiss a case under
> this title, or may suspend all proceedings in a case under this title, at
> any time if—
>
>           (1) the interests of creditors and the debtor would be better
>      served by such dismissal or suspension; or
>
>           (2)(A) a petition under section 1515 for recognition of a
>      foreign proceeding has been granted; and
>
>           (B) the purposes of chapter 15 of this title would be best
>      served by such dismissal or suspension.
>
>      (b) A foreign representative may seek dismissal or suspension under
> subsection (a)(2) of this section.
>
>      (c) An order under subsection (a) of this section dismissing a case or
> suspending all proceedings in a case, or a decision not so to dismiss or
> suspend, is not reviewable by appeal or otherwise by the court of
> appeals under section 158(d), 1291, or 1292 of title 28 or by the
> Supreme Court of the United States under section 1254 of title 28.

[143]     *See Millard*, 501 B.R. at 652 ("if it then appears … that proceedings in the Caymans or this Court would be
used to shelter assets in the U.S. without subjecting them to legitimate debts, the Marianas could come back
to me to seek dismissal of this chapter 15 case under section 305"), and 647 ("And the bad faith that is
alleged to exist is not a legal basis for disregarding the statutory requirements for recognition (although it
might later provide a basis for subsequent relief under section 305, which could cause recognition to be
later vacated)").

B.    *Remedies for Bad Faith*

It perhaps deserves emphasis that the bad faith of Sevilleja and his associates (and hence the Debtors)—which if necessary, could be imputed to the Liquidator under familiar agency principles[144]—was not germane to this Court's recognition analysis.  As discussed above, recognition turned solely on the requirements of section 1517, and the Liquidator's failure to show a COMI (or establishment) in the BVI, by reason of his minimal effort in managing the Debtors' affairs.  But though, here too, the Court does not need to decide what it would have done if it had been compelled to grant recognition here, the Court believes it desirable to note that even in chapter 15, U.S. bankruptcy courts are not helpless in the face of bad faith filing, including of the type this Court has found here.

When recognition is granted as a foreign main proceeding, provisions of other chapters of the Bankruptcy Code become applicable.  Section 1520(a)(1) provides, for example, that upon recognition as a foreign main proceeding, "sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States."

---

[144]    The Court discussed the bases for its view that Sevilleja and his associates have been guilty of bad faith in its Findings of Fact above.  Applying New York law (as the locus where the injury resulting from that bad faith was suffered), the Court finds that the bad faith must at least be imputed to the Debtors.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 ("Of particular importance is a fundamental principle that has informed the law of agency and corporations for centuries; namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals … Corporations are not natural persons.  "[O]f necessity, [they] must act solely through the instrumentality of their officers or other duly authorized agents" … A corporation must, therefore, be responsible for the acts of its authorized agents even if particular acts were unauthorized") (citations omitted).

In fact, under New York's *Wagoner* rule, *see Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir. 1991) ("***Wagoner***"), and its progeny, the acts of the company's wrongdoer management are imputed to an estate fiduciary, even when the fiduciary had no dealings with that management, and when innocent creditors would be the victims.  *See also Mediators, Inc. v. Manney (In re Mediators, Inc.),* 105 F.3d 822, 825–26 (2d Cir. 1997) (applying the doctrine to a bankruptcy trustee); *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86-87 (2d Cir. 2000) (considering the *Wagoner* Rule to be potentially applicable to English and Cayman foreign liquidators).  Most estate fiduciaries (unlike here) have had no dealings with wrongdoer management.  In fact, after replacing wrongdoer management, the estate fiduciaries typically are adverse to the prior management, and it might well be inappropriate to charge future liquidators, at least on bad faith determinations, with the misconduct of the insiders they replaced.  The Court notes that as a potential issue in the future without deciding it here.

-38-

Section 362 of the Code provides for the automatic stay. And—as Sevilleja intended—if recognition were granted, it would trigger the application of section 362 of the Code and in the first instance block Marex's ability to recover any part of the *Refco* Case distributions under Marex's judgment execution. That is why this chapter 15 case was filed.

But section 362, in addition to imposing the stay in the first place, also provides means to obtain *relief* from the stay. Under section 1520, section 362 of the Code applies in its entirety— including its section 362(d)(1), which authorizes relief from the stay "for cause." And relief from the stay, for cause, has long been a classic remedy for bad faith filing.[145]

Reasonable people might question whether relief from the stay is a fully satisfactory substitute for keeping those with bad faith out of the U.S. courts completely. But section 362(d)(1) nevertheless provides at least one means to ensure that the U.S. courts are not wholly helpless to deal with instances of bad faith.

Also, in determining how courts might deal with bad faith if recognition were required, or seemingly required, courts in the future might wish to be mindful of the Second Circuit's repeated reminders in *Fairfield Sentry* that a bankruptcy court is free to examine circumstances

---

[145] *See, e.g., In re Eclair Bakery Ltd.*, 255 B.R. 121, 127-32 (Bankr. S.D.N.Y. 2000) (Gerber, J.) (relief from stay granted for cause in case of bad faith filing); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 335-36 (Bankr. S.D.N.Y. 2001) (Gerber, J.) (relief from stay granted for cause, in case of bad faith filing)*; In re Syndicom Corp.*, 268 B.R. 26, 55 (Bankr. S.D.N.Y. 2001) (Gerber, J.) (debtor's filing of petition was in bad faith, warranting cause for both stay relief and dismissal, though Court considered stay relief the preferable remedy under the circumstances); 3 *Collier on Bankruptcy* ¶ 362.07[7][a] (16th ed. 2015) (discussing bad faith filing as a basis for vacating or annulling the automatic stay).

As Chief Judge Brozman in this District declared:

> [W]hen faced with a motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds. In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.

*In re 234–6 West 22nd Street Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) (Brozman, C.J.).

"to ensure that a debtor has not manipulated its COMI in bad faith."[146]  In *Fairfield Sentry,* the
Circuit repeatedly voiced its sensitivity to the concern that chapter 15 could be invoked in bad
faith, and addressed it specifically in the context of the COMI determination.[147]  Implicit in that
is a willingness to conclude that a bad faith invocation of the Code, even in the face of a literal
compliance with the requirements of section 1517, can trump any apparent COMI premised on
the locale of a foreign representative's activities.  That principle could have significance, for
example, if the foreign proceeding had been commenced for the improper reasons Sevilleja
commenced it here, but the Liquidator had done more work than he did.

To be sure, courts dealing with the issue might need to examine the tension between the
Supreme Court's decision in *Marrama v. Citizens Bank of Massachusetts*[148] (which was decided
before *Fairfield Sentry*) and *Law v. Siegel,*[149] decided after it.  While all would likely agree that
one cannot negate or ignore a requirement of the Code, or otherwise contradict it (with or
without reliance on section 105(a) of the Code, upon which the *Marrama* court relied in part),
the Second Circuit imposed its good faith requirement in a different way in *Fairfield Sentry*.  In
essence the Circuit declared that a COMI manipulated in bad faith would not be a valid COMI
upon which to rely at all.  Though in concept it should be impossible, attempts to create,
manipulate, or otherwise change a COMI in bad faith can occur in a host of different ways.  It is
at least arguable that the combination of *Marrama* and *Fairfield Sentry* is another means to avoid
invocation of the chapter 15 statutory scheme in bad faith.

---

[146]     *Fairfield Sentry,* 714 F.3d at 138.

[147]     *See supra* n.124.

[148]     549 U.S. 375 (2007) ("***Marrama***").

[149]     --- U.S. ---, 134 S.Ct. 1188 (2014).

III.

Remedy; Effective Date of Order

While the Code speaks directly to the effect of an order granting recognition, it does not

do likewise with respect to the effect of an order denying it.  Obviously, upon the denial of

recognition, the foreign representative (here the Liquidator) becomes ineligible to obtain the

benefits of section 1520, or to obtain the additional relief potentially available under section

1521.  Also, when recognition is denied, a U.S. court must consider the extent to which any

interim relief, previously authorized under section 1519 or otherwise, should come to an end.

Here the Court ultimately was not asked to, nor did it, enter any interim relief under

section 1519 or otherwise.  But the Court (joined by Judge Drain) so ordered the Standstill

Stipulation.  From this Court's perspective, that stipulation served as an alternative to section

1519 relief.

With recognition having been denied, the purpose for which the Court "so ordered"—*i.e.*,

approved—the Standstill Stipulation has come to an end.  This Court's approval of the Standstill

Stipulation terminates as of the date this Decision and Order becomes effective (the "**Effective

Date**").  Until now, the Standstill Stipulation has prevented Marex from seeking a release of the

*Refco* Case distributions from the registry of the Court.  But as a consequence of this Decision

and Order, any and all such restraints will be, and hereby are, lifted as of the Effective Date.

Likewise, the need for the *Refco* estate to place distributions in the registry of the Court, rather

than by paying them to Marex pursuant to a judgment enforcement garnishment, will terminate

on the Effective Date as well.

Nevertheless, it is necessary that the release of funds from the Court registry be approved

by a judge of this Court.  Any such request can and should now go to Judge Drain.  To the extent

-41-

the request requires permission from this Court, such a request can be made at any time after the Effective Date.

Finally, for the reasons just noted and for any others for which it matters, the Court has considered what date the Effective Date should be. To the extent the Court might select any date after the date of entry of this Decision and Order, the Court would effectively be issuing a stay under Fed. R. Bankr. P. 8007. With that in mind, the Court has concluded that its order should become effective 14 calendar days from the date of this Decision and Order, but no more than that, and that any further stay of effectiveness must be sought and obtained in the district court.

The decision as to whether or not to grant a stay of an order pending appeal lies within the sound discretion of the court.[150]   In the Second Circuit, courts have historically considered four factors when determining whether to issue a stay of an order pending appeal:

> (1) whether the movant will suffer irreparable injury absent a stay,
>
> (2) whether a party will suffer substantial injury if a stay is issued,
>
> (3) whether the movant has demonstrated "'a substantial possibility, although less than a likelihood, of success'" on appeal, and
>
> (4) the public interests that may be affected.[151]

Since *Hirschfeld* was decided, the likelihood of success requirement has possibly evolved somewhat, with a panel of the Circuit, in *Mohammed v. Reno,* having thereafter stated that "ultimately," it saw "considerable merit" in an approach expressed by the D.C. Circuit under which "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the

---

[150]     *See, e.g., First Nat'l Bank of Boston v. Overmyer (In re Overmyer),* 53 B.R. 952, 955 (Bankr. S.D.N.Y. 1985) (noting that a motion for a stay pending appeal is discretionary.).

[151]     *Hirschfeld v. Board of Elections in City of New York*, 984 F.2d 35, 39 (2d Cir. 1993) ("**Hirschfeld**") (*quoting Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir. 1985); reformatted for ease of reading).

court's assessment of the other [stay] factors"[152]—though that panel did not say (and possibly

could not say) that its view as to this would trump the likelihood of success articulation

appearing in *Hirschfeld*.  Nevertheless, a district judge in this district has seemingly read

*Mohammed* this way,[153] though it later applied the *Hirschfeld* likelihood of success standard in

lieu of *Mohammed's*.[154]

    The appropriate inquiry calls for a balancing of the four factors.[155]  But the moving party

must show satisfactory evidence on all four criteria.[156]

    Here the Court assumes that very shortly after the Effective Date, Marex will seek to

enforce its garnishment of the distributions from the *Refco* estate, including by way of

application to Judge Drain to cause the funds now in the Court registry to be released in favor of

Marex.  Whether irreparable injury to the Liquidator would exist as a consequence of Marex

enforcing its judgments would turn on the ability of Marex to pay back any sums it would

thereby recover if an appellate court ultimately determined that recognition should have been

granted on the facts of this case.  At this point, the Court has no evidence on this either way.  But

the Court assumes, for the brief 14-day stay it will impose, that Marex might not be able to return

---

[152]    309 F.3d 95, 101 (2d Cir. 2002) ("***Mohammed***").

[153]    *See ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 349 & n.48 (S.D.N.Y. 2007) (Scheindlin, J.) ("***Adelphia***") (after quoting the *Hirschfeld* likelihood of success standard as part of its listing of the stay standards, *see id.* at 346 & n.32, going on later to say, in its discussion of likelihood of success, that "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors.  The requisite showing of 'substantial possibility' of success is 'inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the stay.'  Simply stated, more of one excuses less of the other.") (citing *Mohammed* and cases from other circuits).

[154]    *See id.* at 354 (speaking in terms of the *Hirschfeld* likelihood of success standard, "I find that there are several claims on which Appellants have shown a substantial possibility of success on appeal.")

[155]    *See Ofosu v. McElroy*, 98 F.3d 694, 703 (2d Cir. 1996) ("***Ofosu***") ("After weighing the four factors relevant to the grant of a stay…"); *Mohammed,* 309 F.3d at 101 (speaking of weighing of the four factors, citing *Ofosu*); *Adelphia*, 361 B.R. at 347 & n.34 (rejecting contention, as some district and bankruptcy courts have held, that the failure to satisfy any prong "dooms the motion," and stating instead that "the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed") (citing *Mohammed* and *Ofosu*).

[156]    *See Bijan-Sara Corp. v. FDIC (In re Bijan-Sara Corp.)*, 203 B.R. 358, 360 (2d Cir. BAP 1996).

any recovery it obtains.[157]  If a request for any further stay of the Effective Date is made, Marex

can advise the court hearing the request as to its ability to pay back any sums Marex might

recover, and/or the two sides can further confirm or refute the assumptions the Court has made

up to this point.

        As for the second ground, the Court finds no significant injury to Marex (or any other

party) if the brief 14-day stay is issued.  The stay only modestly delays Marex's ability to make a

request to Judge Drain to release funds from the Court registry, and the Court has no doubt that

those funds will remain safely in the Court registry until they are properly released.  Marex is not

materially injured by waiting an additional 14 days to obtain funds that are being safely

maintained.

        On the third ground, the Court does not see a substantial possibility of a reversal.  Not

surprisingly, the Court believes that it has come to the right result.  But beyond that, the Court

does not see the issues as even close.

        With respect to the public interest, the Court sees a strong public interest in foreign

representatives' ability to administer the estates for which they have responsibility in instances in

which there are noninsider creditors to protect.  On the facts here, however, the Court finds that

any action by the Liquidator with either the purpose or effect of further benefitting Sevilleja and

his associates would not at all be in the public interest, and, to the contrary, would run contrary

to it.

---

[157]    Under that assumption, if this were an insolvency proceeding with more than one noninsider creditor to
protect, a liquidator would be prejudiced by the resulting inability to treat similarly situated creditors
equally.  But that is not what we have here.  Under the facts here, the Court sees prejudice to the Liquidator
as present to some degree, but exceedingly modest.

On balance, the Court finds enough to warrant a 14-day stay to provide the Liquidator time to get a fresh look on appeal (and to prove up, if he can, an entitlement to a longer stay), but the Court believes that a stay of no more than that should now be granted.

### Conclusion

For the reasons described above, the Court concludes that the Liquidator has failed to meet the requirements of section 1517(a)(1) of the Code, by reason of his inability to show sufficient activity in the BVI to cause the Debtors' COMI to shift from Spain, Dubai or the U.K. to the BVI or to show even an establishment in the BVI. Thus recognition, as either a foreign main proceeding or a foreign nonmain proceeding, must be, and is, denied.

Marex's cross motion for dismissal under section 305 is moot.

The effectiveness of this Decision and Order will be stayed for 14 calendar days, but no more than that. Any further stay must be sought and obtained in the district court.

SO ORDERED.

Dated: New York, New York
January <u>13</u>, 2016

_____*s/Robert E. Gerber*_____
United States Bankruptcy Judge